UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

DANIEL J. KRAUSS and GERI S. KRAUSS,

        Plaintiffs,

   - against -                           04 Civ. 6080(CM)(GAY)

OXFORD HEALTH PLANS, INC., OXFORD
HEALTH PLANS (NY), INC., and OXFORD
HEALTH INSURANCE, INC.,

        Defendants.

------------------------------------------------------------x

DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

McMahon, J:

## I. Introduction

      Plaintiffs Daniel and Geri Krauss are participants in an employee health insurance plan

offered by defendant, Oxford Health Plans, Inc. While covered by the Plan, plaintiff Geri Krauss

was diagnosed with breast cancer and underwent a bilateral mastectomy and bilateral breast

reconstruction on May 13, 2003. Plaintiffs also retained skilled nurses to provide post-operative

care and treatment over and above that provided by the hospital's own nurses during Ms. Krauss'

hospital stay.

      Plaintiffs paid these charges out-of-pocket and filed claims under the Plan for

reimbursement. Most of plaintiffs' claims were reimbursed in full. However, defendant paid only

$30,000 of the $40,000 billed by the physician for the initial bilateral breast reconstruction

surgery, on the grounds that the amount charged by the out-of-network physician selected by

plaintiffs exceeded the usual, customary, and reasonable rate (UCR rate) for the procedure.

Oxford also noted that in-network providers were capable of performing the same procedure. Defendant denied the $8,300 paid by plaintiffs for the additional nursing services, on the ground that the Plan did not cover such the cost of private or special duty nursing.

Plaintiffs sought reconsideration of these denials through defendant's grievance procedures; their claims were again denied. Plaintiffs then brought suit in this Court under the Employee Retirement Income Security Act (ERISA), alleging a failure to pay claims under the terms of the plan, non-compliance with applicable disclosure provisions, breach of fiduciary duty, and violation of the Woman's Health and Cancer Rights Act. They seek full reimbursement, statutory damages, a declaratory judgment striking any UCR limits on from post-mastectomy breast reconstructions, and attorney's fees.

Both defendant and plaintiffs now move for summary judgment. For the reasons stated below, plaintiffs' motion is denied, and defendant's motion is granted.

## II. Facts

Plaintiffs Daniel and Geri Krauss at all times were participants in an ERISA-covered employee health insurance plan – entitled Group Medical Plan HH032*04 ("The Plan") – marketed by defendant Oxford Health Plans as the "New York Freedom Select" plan. Complaint ("Cmplt.") ¶ 11. The Plan was established and sponsored by Mr. Krauss' employer, Hahn & Hessen LLP. Cmplt. ¶ 8. Ms. Krauss was covered by the Plan as Mr. Krauss' spouse. Cmplt. ¶ 10.

<u>A. Medical History</u>

In early 2003, plaintiff Geri Krauss was diagnosed with breast cancer by Dr. Peter Pressman, a surgeon at Weill Cornell Medical Center in New York. Cmplt. ¶ 19. The cancer was found to be quite advanced, and it was recommended that she undergo a bilateral mastectomy – removal of both breasts in one procedure. <u>Id.</u> "Bilateral" surgery is any operation in which the surgeon performs the same procedure on the same body part on both sides of the body, such as surgery on both knees, both wrists, or both breasts. OHP 00000160. Dr. Pressman charged $8,000 for this procedure. Cmplt. ¶ 20.

 Plaintiffs were also told to find a surgeon for post-mastectomy breast reconstruction. After consultation, plaintiffs retained Dr. Mark Sultan, a plastic surgeon, to perform the procedure. Cmplt. ¶ 22. Plaintiffs opted for a type of reconstruction known as "microvascular" breast reconstruction, which was to be performed during the same surgical session as the bilateral mastectomy. Medical literature recommends microvascular breast reconstruction over older reconstructive methods such as implants or pedicle flaps, as it involves greater integration of the patient's own tissue in the reconstruction, and therefore speeds healing and minimizes complications.  Cmplt. ¶¶ 22, 24; OHP 00000279. The technique is difficult and requires a high level of skill; plaintiffs were informed that, "There were only two or three other surgeons in New York who had similar experience and expertise" to Dr. Sultan with this procedure. Cmplt. ¶ 24.

In addition to an initial $200 consultation fee, Dr. Sultan's fee for a bilateral breast reconstruction was $40,000, which was twice his normal $20,000 rate for reconstruction of one breast. Cmplt. ¶ 26. In other words, his charge for bilateral surgery afforded the patient no discount for the fact that both surgeries were being performed at the same time, with whatever

savings in time, office visits, aftercare, and the like were realized.

Oxford pre-certified the reconstructive surgery by letter dated May 5, 2003. OHP 00000281. The pre-certification letter makes reference to the patient, her Plan, her Diagnosis Code, the Service Code of the proposed treatment, and the treating physician and facility. Id. It does not specifically mention any limitation on the amount that would be reimbursed. Id. However, it addresses coverage for the pre-certified procedure in general terms:

> Oxford's Medical Management Department does not assess whether the Member has reached their maximum dollar limit for a service. . . . Payment for approved services will be consistent with the terms, conditions, and limitations of the Member's Certificate of Coverage, the provider's contract, as well as with Oxford's administrative and payment policies.

Id.

The letter refers only to the reconstructive surgery performed by Dr. Sultan and does not refer to Dr. Pressman's mastectomy. Id. However, the parties agree that both surgeries were pre-certified. Def's R. 56.1 Statement ¶ 13; Pl's R. 56.1 Statement ¶ 13.

Drs. Pressman and Sultan performed the twelve-hour surgery as scheduled on May 13, 2003. They noted only minor complications during the surgery. Cmplt. ¶¶ 30-31.

After the surgery, specialized nurses recommended by Dr. Sultan took charge of the plaintiff to monitor the viability of the flaps and perform necessary chest physiotherapy. Cmplt. ¶ 32. The nurses were not members of the regular hospital staff; they were hired to care for Geri Krauss exclusively and they served no other patients while they were on duty. The total fee for nursing services was $8,300. Cmplt. ¶ 33. Plaintiffs paid the nurses every day. OHP 0000226-36.

A few hours after the surgery, one of these private duty nurses noticed venous congestion in the left breast – a complication that threatened the viability of the reconstruction. Cmplt. ¶ 34.

Dr. Sultan corrected the problem the next day by employing medicinal leeches. Cmplt. ¶ 35. Ms. Krauss exhibited no other complications until nine days after the procedure, when she suffered a hemorrhage in the right reconstructed breast. Cmplt. ¶ 37. According to Dr. Sultan, such a delayed complication was extremely rare. Id. Dr. Sultan had to address the hemorrhage surgically on May 23, 2003. Id. Oxford pre-certified the surgery on an emergency basis. Dr. Sultan charged $2,500 for the procedure. Cmplt. ¶¶ 40-41. Ms. Krauss was finally discharged from the hospital on May 26. Cmplt. ¶ 42.

On September 22 and October 13, 2003, Dr. Sultan performed the second stage of the reconstructive surgery – bilateral nipple reconstruction – in two phases. Cmplt. ¶¶ 44-45. Both phases were bilateral surgeries, with initial nipple reconstruction in September and revision of the reconstruction in October. Id. The cost for these operations was $6,000 and $4,000, respectively. Id. These procedures were completed without complications.

## B. The Plan

The Plan's terms are set out in three documents: the Summary of Benefits (listing covered services with summaries of deductible and co-insurance requirements), P00117-26, OHP 0000002-11; the Certificate of Coverage (setting terms and conditions of the Plan's "in-network" coverage), P00128-68, OHP 00000016-62; and the Supplemental Certificate of Coverage with Grievance Procedure (setting terms and conditions of the Plan's "out-of-network" coverage), P00189-238, OHP 00000063-103. These three documents were provided to all Plan participants, including plaintiffs.

Because plaintiffs used out-of-network providers exclusively, the "Supplemental Certificate," as opposed to the "Certificate," contains the relevant terms of the Plan.

Federal law requires all health insurance plans to contain a statement offering coverage of mastectomies and breast reconstruction in compliance with the Women's Health and Cancer Rights Act of 1998. See 29 U.S.C. § 1185 (2000). The Plan documentation includes such a statement. P00116, OHP 00000014.

*1. Covered Services*

The Supplemental Certificate defines "Covered Services" in Section III of the Supplemental Certificate, and specifies "Exclusions and Limitations" on coverage in Section IV. Section III lists available areas of covered services: post-mastectomy breast reconstruction is specifically covered, as are "surgical... procedures, on an inpatient and outpatient basis... together with preoperative and postoperative care." P00198-99, OHP 00000073-74. Both require pre-certification, but are otherwise covered by the Plan. Id.  Section IV lists "private or special duty nursing" among the other exclusions from coverage. P00203, OHP 00000079.

*2. Cost Controls: Deductibles and Co-Insurance*

"Covered Services" also states, in bold, that reimbursement of such services may be limited by "deductibles, co-insurance, and UCR" as set forth in the Summary of Benefits. P00197, OHP 00000072. Section I (7) of the Supplemental Certificate, entitled "Your Financial Obligations,"  defines deductibles, co-insurance, and amounts in excess of the UCR as costs that must be covered by the participant rather than the insurance company. P00195, OHP 00000070.

Deductibles and co-insurance are defined, respectively, as fixed amounts and percentages of the amount billed for a covered service that must be paid by the Plan participant. The Plan caps the total dollar amount of deductibles and co-insurance that a participant must pay annually; after this limit is reached, a participant is no longer responsible for paying deductibles or co-

insurance. P00195-96, OHP 00000070-71. The Supplemental Certificate refers Plan participants

to the "Summary of Benefits," a ten-page list of covered services, for specific deductible and co-

insurance information. P00195, OHP 00000070 (referring to the Plan Schedule of Benefits).

Plaintiffs had already paid their maximum amount of deductibles and co-insurance prior

to the May 13, 2003 mastectomy. Cmplt. ¶ 58.

*3. Cost Controls: UCR Limitations*

In addition to deductibles and co-insurance, reimbursement for any covered service is

capped by a "UCR" limit – the "usual, customary, and reasonable" rate charged for a covered

service in the claimant's area. P00196, OHP 00000071. The Plan defines UCR as follows:

> A UCR schedule is a compilation of maximum allowable charges for various
> medical services. They vary according to the type of provider and geographic
> location. Fee schedules are calculated using data compiled by the Health
> Insurance Association of America (HIAA) and other recognized sources. What
> We Cover/reimburse [sic] is based on the UCR.[1]

Id. The "Definitions" section of the Supplemental Certificate provides a second definition

for UCR: "The amount charged or the amount We [sic] determine to be the reasonable

charge, whichever is less, for a particular Covered Service in the geographical area it is

performed." P00211, OHP 00000088.

The Plan also states in several places that defendant would only reimburse out-of-

network providers at up to the UCR limit for the service provided. P00205, 00209, OHP

00000082, 00000086. If a charge exceeds the UCR limit for that service, participants are

required to pay the difference; unlike deductibles and co-insurance, there is no annual

maximum on a participant's obligation to pay UCR cost overruns.

---

[1]The HIAA now does business as "Ingenix."

The UCR limit for a given service is calculated based on the amounts charged for that service by local health care providers. UCR data is compiled for each procedure defined in the AMA's Current Procedural Terminology Manual (the AMA assigns a unique "procedure code" to all current medical procedures). See Certification of John T. Seybert, Exhibit C. The Plaintiffs' Plan sets its UCR limit for each covered service at the 90th percentile; meaning that all claims for covered services are reimbursed at up to the level charged by 90% of local providers. A 90th percentile cap is apparently common for the best health plans.

Defendant does not gather pricing data itself. Rather, as described in the Plan, it purchases a commercial database published by Ingenix (formerly known as the Health Insurance Association of America, or "HIAA"), an insurance industry group, that surveys claims data reported by local providers to participating insurance companies. P00196, OHP 00000071.

Bilateral surgeries do not have a unique procedure code, and are not part of HIAA's database. Rather, defendant sets the UCR limit for bilateral surgeries at 150% of the rate for a single surgery of the same type. Defendant bases this approach on industry practices and studies which concluded that multiple surgeries require only 140%-150% of the work of single surgeries. Medicare Program; Revisions to Payment Policies Under the Physician Fee Schedule, Other Part B Payment Policies, and Establishment of the Clinical Psychologist Fee Schedule for Calendar Year 1998, 62 Fed. Reg. 33158, 33171 (June 18, 1997)). New York Insurance law permits (but does not require) multiple surgeries to be covered at 150% of the rate for single surgeries. See 11 N.Y.C.C.R.R. §

52.18(b)(10) (2005).

Defendant's UCR limit for single "free-flap" breast reconstructions (the type performed by Dr. Sultan) is $20,000. Therefore, its UCR limit on bilateral free-flap breast reconstructions is 150% of that amount, or $30,000, the amount reimbursed to plaintiffs.

The Plan documents state that it offers a "Very High" UCR. Cmplt. ¶ 75. The documents do not disclose details regarding the method of calculating the UCR through a 150% modifier for bilateral surgeries. Nor does the Plan provide participants with a schedule of UCR limits.

C. Claims History

In May and June, plaintiffs paid Dr. Sultan's fees, including the $40,000 fee for the primary bilateral breast reconstruction. Cmplt. ¶ 46. Plaintiffs timely submitted all claims for surgery and nursing services to Oxford. Cmplt. ¶ 57.

On June 10, 2003, Oxford paid the $8,000 fee for the bilateral mastectomy directly to Dr. Pressman in full. Cmplt. ¶ 59.

On June 13, plaintiffs received a $30,200 check for Dr. Sultan's May 13 breast reconstruction: $30,000 of the $40,000 fee charged by Dr. Sultan for the surgery, plus his initial consultation fee of $200. P00314 An Explanation of Benefits enclosed with the $30,200 check stated, "A30: This claim reflects industry standards for payment of services which include two surgical procedures." Id.

On June 16, 2003, defendant sent a check for $500 of the $2500 charged for the May 23 surgery to repair the right breast hemorrhage. P00315. An Explanation of Benefits enclosed with the check stated, "This claim has been paid at 100% of the applicable rate for the services

received." Id. Plaintiffs then resubmitted the claim, and received an additional $2000 on October 16, 2003 – the remainder of the amount billed. P00321. Defendant did not give a reason for delaying payment in full. Id.

On October 7, 2003, defendant refused to pay plaintiffs' $6,000 claim for the September 22 nipple reconstruction, on the grounds that the surgery was not covered under the Plan. P00319. The claim was resubmitted, however, and it was reimbursed in full on October 31. P00323.

On December 3, 2003, defendant paid the $4,000 claim for the second phase of the nipple reconstruction, which took place on October 13. P00325.

Thus, the only amounts that were not reimbursed in full by Oxford were $10,000 of Dr. Sultan's $40,000 fee for the May 13 surgery and the cost of the private duty nursing.

Plaintiffs filed a grievance on November 10, 2003, appealing the denial of these claims. Actually, defendant had not submitted a written response to plaintiffs regarding the claim for reimbursement of the cost of the private duty nurses, so in their grievance plaintiffs demanded that this claim be addressed. OHP 00000197-99. Defendant allegedly did not acknowledge plaintiffs' grievance within five days, as required by the Plan. Cmplt. ¶ 70. However, by letter dated December 1, Dr. Nancy Klotz, defendant's Medical Director, sustained Oxford's refusal to reimburse plaintiffs for th $10,000 surgical fee. Def's R. 56.1 Stmt ¶¶ 65-66. The letter said, "The cpt code19364-50x1 was paid at the usual and customary rate. . . . [Oxford has] participating providers performing the procedure effectively. . . . there is no medical reason as to why to grant an exception outside the UCR" OHP 00000210. The letter did not address the request for reimbursement of the nursing fees. Id.

A second letter, dated December 2, 2003, advised plaintiffs that the claim for nursing services was being forwarded to the Claims Department. Cmplt. ¶ 73.

Plaintiffs, by letter dated December 9, 2003, objected to the failure of Oxford to specify why it was withholding benefits and sought documents explaining the reasons for the denial – specifically, seeking details about procedure code 19364-50x1, the method of calculating UCR for that procedure, and reasons for Oxford's finding that the $40,000 fee exceeded the UCR. Id.

By letter dated December 11, 2003, defendant restated its denial. OHP 00000211. Although the text of the letter differs from the December 1 letter, its content is in all respects the same.

On January 26, 2004, without having received any additional documentation from Oxford, plaintiffs filed a second-level appeal. OHP 00000263-68. Their request stated that defendant was in violation of ERISA and its own policies in failing to pay plaintiffs' claims or provide any disclosure related to its denial of benefits. Id.

That same day, plaintiffs received a letter from defendant, dated January 21, 2004, which again restated defendant's denial of benefits. OHP 00000270-71.

On February 24, 2004, Oxford provided materials in response to plaintiffs' December 9 request for documents, including several policies related to reimbursement of single and multiple surgeries. These materials included a new Explanation of Benefits for the May 13 reconstructive surgery, which stated:

A30 This claim has been adjusted in accordance with generally accepted insurance industry standards for bilateral surgical claims. The full usual customary and reasonable (UCR) allowance is provided for the primary procedure and 50% of the UCR amount is allowed for the subsequent procedure.

Cmplt. ¶ 93. This version of the Explanation of Benefits was not seen by plaintiffs prior to February 2004. Id.

Plaintiffs responded by letter on February 26, claiming that UCR limit was not set forth in the Plan or its supporting documentation; that application of the rule had been concealed in prior denials of benefits; that the rule violated both state and federal law by denying full compensation for post-mastectomy breast reconstruction; that the rule was not applied to any other bilateral procedures; and that such a rule unjustifiably favored multiple single surgeries over bilateral surgeries. OHP 00000257-59.

Plaintiffs' second-level appeal was formally denied by letter on March 11, 2004. OHP 00000250-52. This letter defined the process for calculating single and bilateral UCR levels and specified that the UCR for a single breast reconstruction was $20,000. Id. The letter also stated that the 150% cap on bilateral procedures was "consistent with industry standards and in accordance with New York state insurance regulations," and that its UCR limitations were well-publicized. Id. It also stated that its treatment of bilateral breast reconstructions was no different than that of other bilateral surgeries, all of which were reimbursed at the lesser of the amount billed by the physician or 150% of the UCR for that procedure. Id.

D. Plaintiffs' Claims Under ERISA

After receipt of the March 11 letter, plaintiffs brought suit in this Court under the civil enforcement provisions of ERISA, seeking:

(1) damages under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), for violations of the

Women's Health and Cancer Rights Act, 29 U.S.C. § 1185(a), and the terms of the Plan itself, based on defendant's failure to provide complete reimbursement for plaintiff's $40,000 post-mastectomy breast reconstruction;

(2) damages under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) for failure to reimburse plaintiffs claims for nursing services totaling $8,300;

(3) equitable relief under ERISA § 502 (a)(3), 29 U.S.C. § 1132(a)(3), for breach of defendant's fiduciary duty;

(4) statutory damages under ERISA § 502(c)(1), 29 U.S.C. § 1132(c)(1), and ERISA § 503(2), 29 U.S.C. § 1133(2), for failure to disclose plan information or address plaintiffs' appeals;

(5) a declaratory judgment barring the application of the 150% cap on reimbursements for post-mastectomy breast reconstruction; and

(6) attorney's fees and costs under ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1).

Defendant now moves for summary judgment on the grounds that the UCR limit is reasonable and was fairly applied in this case; that the terms of the Plan do not provide for coverage of nursing services; that defendant is not subject to disclosure requirements under ERISA; that plaintiffs have not stated a cause of action for defendant's handling of their claims; and that plaintiffs lack standing to sue for equitable relief. Plaintiffs oppose defendant's motion and move for summary judgment on their claims.

**Discussion**

A. Plaintiffs' First and Fifth Causes of Action: Claims Related to Dr. Sultan's Fee

Plaintiffs' first and fifth causes of action seek restitution for the unpaid balance of Dr. Sultan's $40,000 fee, and a declaratory judgment that defendant's UCR limit of $30,000 may not be applied to post-mastectomy bilateral breast reconstructions. Plaintiffs claim that any limit on reimbursement for breast reconstruction attributable to application of a UCR is impermissible under the 1998 Woman's Health and Cancer Rights Act, which requires insurance carriers to cover post-mastectomy breast reconstructive surgery. In the alternative, they claim that Oxford's method of calculating the UCR for bilateral surgery is arbitrary and capricious under the terms of the Plan itself, and that the UCR was applied to them an arbitrary and capricious fashion. Finally, they claim that the complexity of plaintiff's surgery and Dr. Sultan's special skill at performing it warrant deviation from the UCR in this case.

While the court is sympathetic to plaintiffs, all of their arguments fail.

*1. The Women's Health and Cancer Rights Act Does Not Prohibit the Plan
From Applying UCR Limits on Post-Mastectomy Breast Reconstruction.*

Plaintiffs contend that The Women's Health and Cancer Rights Act of 1998, Pub. L. 105-277, §§ 901-03, 112 Stat. 2681 (1998) (codified at 29 U.S.C. § 1185b) ("the WHCRA"), mandates full reimbursement for post-mastectomy breast reconstruction. The WHCRA requires that any group health plan:

> that provides medical and surgical benefits with respect to a mastectomy shall provide, in a case of a participant or beneficiary who is receiving benefits in connection with a mastectomy, and who elects breast reconstruction in connection with such a mastectomy, coverage for –

> (1) all stages of reconstruction of the breast on which the mastectomy has been performed;
>
> (2) surgery and reconstruction of the other breast to produce a symmetrical appearance; and
>
> (3) prostheses and physical complications of mastectomy, including lymphedemas;
>
> in a manner determined in consultation with the attending physician and patient. Such coverage may be subject to annual deductibles and coinsurance provisions as may be deemed appropriate and as are consistent with those established for other benefits.

Id. Because Congress did not include specifically state that coverage was "subject to" UCR limits – only to "annual deductibles and coinsurance" – plaintiffs argue limiting reimbursement on the basis of a UCR regime is implicitly unlawful. Plaintiffs point out that in other, similar legislation – specifically, the Mental Health Parity Act, Pub. L. 104-204, §§ 701-703, 110 Stat. 2874, 2944-50 (1996), and the Newborns' and Mothers' Health Protection Act, Pub. L. 104-204, §§ 601-606, 110 Stat. 2874, 2935-44 (1996), both of which were passed prior to WHCRA – Congress used the phrase "deductibles, co-insurance *and other cost-sharing.*"(Emphasis added) Plaintiffs argue this indicates that Congress knew how to include UCR caps if it had wished to do so.

The argument seems an appealing one. However, that is not how the doctrine of *expressio unius est exclusio alterius* ("to express one thing is to exclude another") works, at least in the context of statutory construction. Textual omissions within a statute do not necessarily imply the exclusion of such omitted cases from the scope of the law. Courts ".....do not read the enumeration of one case to exclude another unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it." Barnhart v. Peabody Coal Co., 537 U.S. 149, 168, 123 S. Ct. 748, 760 (2003). *Expressio unius* properly applies only when, in the natural

association of ideas in the mind of the reader, what is expressed ".......is so set over by way of strong contrast to that which is omitted that the contrast enforces the affirmative inference." Chevron U.S.A. Inc. v. Echazabal, 536 U.S. 73, 81, 122 S. Ct. 2045 (2002) (quoting E. Crawford, Construction of Statutes 337 (1940)).

Congress's use of the words "annual deductibles and coinsurance provisions" does not "enforce the affirmative inference" necessary to apply *expressio unius*, because there is no natural association in a reader's mind between the ideas expressed (deductibles and coinsurance) and the idea not expressed (UCRs) in the text of the statute. It is not possible to conclude, from the contrast between the text of WHCRA and the predecessor statutes cited by plaintiffs, that Congress specifically considered UCRs and decided to disallow them.

Consideration of WHCRA's legislative history and the goals of its supporters reinforces this conclusion. WHCRA was passed to prevent insurers from declining coverage for reconstructions under a Plan's usual and customary terms. At the time WHCRA was under consideration, insurers quite commonly refused to pay for breast reconstruction after mastectomy, on the ground that it was a "cosmetic" procedure and was "not medically necessary." 144 Cong. Rec. S. 4644, 4650 (1998). The statute addressed this problem by requiring insurers to reimburse their insureds for post-mastectomy breast reconstruction. See id. at 4648. Nothing in the legislative history affirmatively indicates that the insurer must offer better coverage for breast reconstruction than it offers for the mastectomies that necessitate them, or for other life-saving procedures. There is no mention in the legislative history of any need to reimburse plastic surgeons more fully than other surgeons, and it defies logic to assume that Congress would have imposed such a requirement sub silentio, or by negative inference. Yet that

is what plaintiffs would have me conclude. I decline to do so.

Plaintiffs refer this Court to the Senate debate on the bill, in which Senators spoke of the need to "guarantee the right to have a complete reconstruction," id. at 4650; and to "restore a woman's wholeness" through mandatory insurance coverage of post-mastectomy breast reconstruction. Id. at 4649. But neither those statements nor any other made during the Senate debate either flat out says or fairly implies that an insurance provider must "restore a woman's wholeness" by reimbursing her for 100% of the amount billed by her surgeon, regardless of the other terms and conditions of the Plan. The bill only states that "coverage" must be provided. It is beyond cavil that plaintiffs received "coverage" for her reconstruction surgery. And, as will be seen below, Ms. Krauss received it on exactly the same basis as she received coverage for her other surgeries. In other words, the coverage was commensurate with the terms and conditions of her policy and did not discriminate against this particular form of surgery.

Therefore, the WHCRA does not entitle plaintiffs to relief, either declaratory or monetary.[2]

*2. The Application of a $30,000 UCR Limit to Bilateral Reconstructive Surgeries Was Not Arbitrary and Capricious*

*(i) Standard of Review*

ERISA provides a federal cause of action for a covered insurance plan participant or beneficiary, "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

---

[2] Plaintiffs, in their administrative appeals, also argued the Plan's UCR limits were preempted by New York Insurance Law § 3221, which requires coverage of post-mastectomy breast reconstruction in language very similar to that of the WHCRA. Cmplt. ¶ 98. Plaintiffs abandoned that line of argument in their complaint, and I do not address it here.

28 U.S.C. § 1132 (2005). "A denial of benefits challenged under [ERISA] must be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 957 (1989). "Where the written plan documents confer upon a plan administrator the discretionary authority to determine eligibility, we will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious." Pagan v. Nynex Pension Plan, 52 F.3d 438, 441 (2d Cir. 1995) (internal quotations omitted). The fiduciary has the burden of proving that a more deferential standard applies. See Kinstler v. First Reliance Standard Life Ins. Co., 181 F.3d 243, 249 (2d Cir. 1999). However, plaintiffs are entitled to *de novo* review if it is shown that defendant failed to act upon a claim request or appeal by a Plan participant. See Nichols v. Prudential Ins. Co. of Am., 406 F.3d 98, 109 (2d Cir. 2005).

In this case, the relevant provision of the Plan states that "We [defendant] may adopt reasonable policies, procedures, rules, and interpretations to promote the orderly and efficient administration of this Certificate." P00209, OHP 00000086. Such language has been held to grant discretionary authority in a plan fiduciary. See Feder v. Paul Revere Life Ins. Co., 228 F.3d 518, 523 (4th Cir. 2000). Therefore, except as otherwise noted, I review the determinations of the claims examiners under an arbitrary and capricious standard.

*(ii) Defendant's Methodology for Calculating UCR Limits for Multiple Surgeries Is Not Arbitrary or Capricious.*

Plaintiffs argue that limiting reimbursement for bilateral surgery to 150% of the single surgery rate is inherently arbitrary and capricious. Cmplt. ¶ 113. It is not.

There is nothing irrational about concluding that a surgeon ought not be reimbursed at double his normal rate for performing bilateral surgery like Ms. Krauss's breast reconstruction. Surgeons generally charge a flat fee for an operation, which fee covers not only the surgery itself, but also pre- and post-operative consultations and hospital visits during the post-surgical period. Repairing or replacing two organs at the same time makes use of the same facilities, requires only one hospital stay, and is generally less time-consuming for the doctor as well as the patient. Independent studies, conducted by the Harvard School of Public Health in 1993, concluded that multiple and bilateral surgeries required only forty to fifty percent more work than would be required for a single surgery of the same type. See Medicare Program; Refinements to Geographic Adjustment Factor Values and Other Policies Under the Physician Fee Schedule, 59 Fed. Reg. 32754, 32768 (June 24, 1994).

It is, therefore, neither arbitrary nor capricious for an insurance company to conclude that those savings be reflected in a lower rate of reimbursement for, say, reconstructing two breasts rather than one. And while plaintiffs are correct that they might well have been fully reimbursed if Mrs. Krauss had her reconstructions singly rather than bilaterally, that does not render some sort of limitation on the performance of bilateral surgery arbitrary or irrational.

Neither is setting the reimbursement at 150% of the comparable single surgery rate arbitrary or capricious. The 150% modifier for bilateral procedures has been adopted by Medicare and state insurance law as an acceptable floor on reimbursement for multiple surgeries

-19-

performed in the course of the same operation. See 59 Fed. Reg. p. 32767; 11 N.Y.C.C.R.R. § 52.18 (b)(10). While such rules are not dispositive, they support defendant's argument that application of a 150% modifier is a standard procedure in the insurance industry. I am not prepared to conclude that Medicare's floor is arbitrary or capricious, and so cannot conclude that Oxford's rate is. Ungenerous, yes – but not arbitrary.

Plaintiffs rely on the recent holding in Schwartz v. Oxford Health Plans, 175 F. Supp. 2d 581 (S.D.N.Y. 2001). In that case, this court concluded that it was arbitrary and capricious for an insurer to cap reimbursement for cancer medications at 110% of the drug's wholesale price. The Schwartz court found no support in plan documents for capping coverage based on wholesale drug prices – which are, of course, not the prices charged to plan participants – and Oxford offered no factual basis for tying reimbursements to wholesale prices, which are not the prices charged to plan participants. See id. at 591. Ingenix data on the retail prices for these drugs was available, but plaintiffs did not use them and offered no logical reason for not doing so. See id. at 591-92.

Schwartz has no applicability here. In this instance, Oxford calculates its UCR caps using Ingenix's database. That data reflects the amounts actually billed to consumers by local providers for particular covered services. It is a "retail," not a "wholesale" database, so by using Ingenix data, Oxford is not ignoring a better or more readily-available source of such information, as it clearly was in Schwartz.

While plaintiffs argue that Ingenix used too few data points when calculating the UCR for a rarely-performed procedure like microvascular breast reconstruction, I find the sample size is adequate to preclude a finding of arbitrariness or capriciousness. Insurance providers may, as

a matter of law, rely on even a small number of local service providers to determine usual and customary charge limits. See Midpoint Serv. Provider, Inc. v. Conn. Gen. Life Ins. Co., 152 F. Supp. 2d 306, 313 (S.D.N.Y. 2001) (citing Florence Nightingale Nursing Serv., Inc. v. Blue Cross/Blue Shield of Ala., 41 F.3d 1476, 1482 (11th Cir. 1995)). The Ingenix data relied on by defendant here is based on a sample size of ten providers, OHP 00000297. That is a greater number than the sample sizes upheld in Midpoint Services (three service providers) or Florence Nightingale Nursing Services (seven nursing facilities). Therefore, it was not arbitrary or capricious for Oxford to set the reimbursement rate for single breast reconstruction at $20,000 under the Plan.

*(iii) Defendant's Disclosure of UCR Limits Is Sufficient Under ERISA § 1022.*

Plaintiffs next argue that Oxford's failure to disclose how it calculates UCR limits, either in its Plan documents or in response to plaintiffs' early requests for reimbursement and subsequent appeals, renders application of the UCR cap arbitrary and capricious.

The Plan documents clearly state that reimbursement "is based on the UCR," and that "A UCR schedule is a compilation of maximum allowable charges for various medical services." OHP 00000071. It also states that UCR limits "vary according to the type of provider and geographic location.... [they] are calculated using data compiled by the Health Insurance Association of America." P00196, OHP 00000071. Finally, the Plan documents clearly indicate that Supplemental Coverage (for out-of-network providers like Dr. Sultan) is limited to, "The amount charged [by the physician] or the amount We determine to be the reasonable charge, *whichever is less*, for a particular Covered Service in the geographical area it is performed." P0021, OHP 00000088. (Emphasis added)

Thus the Plan documents clearly disclose that there may be some limitation on the amount of reimbursement, and in particular, where out-of-network providers are involved, that reimbursement will be limited to the lesser of the fee charged by the physician or the amount that Oxford determines to be reasonable.

The Plan documents also disclose who pays any difference between the physician's bill and the UCR for a particular procedure in a particular area: the insured. Section I .7 of the Supplemental Certificate, entitled "Your Financial Obligations," specifically provides that participants must pay any amounts billed in excess of UCR limits. OHP 00000082.

The Plan documents do not include any UCR schedule for covered procedures. Defendant did not mention any reimbursement caps when it pre-certified plaintiff's surgery. Although defendant has asserted that the UCR was otherwise "publicized," it does not tell me where UCR data about specific procedures is to be found. I conclude, based on the foregoing, that plaintiffs were not told, prior to the partial denial of their claim, that Dr. Sultan's $40,000 fee exceeded the amount that Oxford was prepared to pay for bilateral microvascular breast reconstruction.

However, ERISA does not mandate such disclosure in Plan documents. 29 U.S.C. § 1022 sets out the requirements for descriptions of coverage within plan documents. It states:

> The summary plan description... shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan.

Id. Furthermore, (1) the summary plan description format may not mislead or fail to inform participants and beneficiaries about the plan; and (2) any limitations or restrictions of plan

benefits must not be minimized, rendered obscure, or otherwise made to appear unimportant. See 29 C.F.R. § 2520.102-2(b). Limitations or restrictions must be contained or referenced within a "relevant section of the [summary plan documents]" provided to participants. Burke v. Kodak Ret. Income Plan, 336 F.3d 103, 111 (2d Cir. 2003). Burke further requires that plaintiffs show "that a plan participant or beneficiary was likely to have been harmed as a result of a deficient SPD [summary plan document]." Id. at 113.

There was nothing misleading about the plan documents, and they did not minimize or obscure any limitation or restriction on coverage. The documents clearly set forth the limitation on coverage created by Oxford's use of UCR limits and Plaintiffs' responsibility to pay amounts over and above the UCR. These clearly constitute "rights and obligations under the plan," and plaintiffs were apprised of these rights and obligations. Plaintiffs do not argue that they were unaware of the relevant language in the Plan.

Given that fact, defendant's failure to provide more specific information about what the particular UCR limit was or how it was calculated is not a violation of ERISA. Defendant's statement "Fee schedules are calculated using data compiled by the Health Insurance Association of America (HIAA)" provides a sufficient summary of their process to satisfy the requirements of 29 U.S.C. § 1022. It correctly states that the basis of its UCR schedule is the HIAA data, and that the schedules are "calculated" based on that data. This statement "reasonably apprise[s]" participants that their reimbursements under the plan may be capped if their doctor's fee exceeds the UCR limit.

Of course, Oxford could have distributed its UCR schedules and policies to participants (assuming such publication did not violate its license agreement with Ingenix). However, ERISA

in no way *requires* such disclosure. Health insurance providers may, in fact, adopt "cost-containment mechanisms" without any notice to plan participants, provided that doing so does not violate any term of the plan. See Nechis v. Oxford Health Plans, 421 F.3d 96, 102-103 (2d Cir. 2005) (citing Ehlmann v. Kaiser Foundation Health Plan, 198 F.3d 552, 556 (5th Cir. 2000); In re Managed Health Care Litig., 150 F. Supp. 2d 1330, 1356 (S.D. Fla. 2001)). Even such "cost containment mechanisms" as bonuses to doctors to limit referrals or payments to claims reviewers to reduce claims are not required to be disclosed in Plan documents. See In re Managed Health Care Litig., 150 F. Supp 2d at 1356.

Of course, where a plan participant asks for information about cost-containment procedures from her insurance provider, a duty to disclose may arise. See In re Managed Health Care Litig., 150 F. Supp 2d at 1356, n.22. But nothing in the record suggests that plaintiffs sought any information about potential limitations on the reimbursement of Dr. Sultan's fee prior to her surgery, or that Oxford either withheld information in response to such a request or otherwise misled plaintiffs into thinking that the entire $40,000 fee would be covered. Plaintiffs were on notice that Oxford would be reimbursing the lesser of Dr. Sultan's fee or the reasonable amount of services rendered as determined by Oxford. They could have asked how this provision would apply to their situation. They did not ask until they obtained reimbursement for less than the full amount of the $40,000 surgical bill. Defendant *did* provide the applicable UCR schedules to plaintiffs in response to their December 9 request. It is not defendant's fault that plaintiffs did not ask for this specific information until after the surgery. Oxford violated no duty to disclose.

*(iv) The UCR Limit Was Uniformly Applied to Plaintiffs' Surgeries.*

Plaintiffs next argue that defendant selectively applied it to Dr. Sultan's fee for the breast

reconstruction while paying their claim for other bilateral surgeries in full.

The application of the UCR to one procedure may violate ERISA if it is not uniformly applied to all service providers in the same geographic area. In <u>DeAngelis v. Warner Lambert Co.</u>, 641 F. Supp. 467, 470 (S.D.N.Y. 1986), the court held that "whether the challenged interpretation has been uniformly applied in similar situations" is a significant factor in determining whether a denial of benefits was arbitrary and capricious. The "uniform application" test has since been invoked in cases of limitations or denials of benefits. <u>See</u> <u>Sansevera v. E.I. DuPont de Nemours & Co.</u>, 859 F. Supp. 106, 115 (S.D.N.Y. 1994) (holding that a denial of benefits to plaintiff suffering from chronic fatigue, while granting benefits under a different standard to others, was arbitrary and capricious).

In this case, plaintiffs' argument betrays a misunderstanding of how Oxford reimbursed plaintiffs for their various medical expenses. Oxford's UCR cap for a single microvascular breast reconstruction was $20,000. That happened to be the fee charged by Dr. Sultan for his work on one breast. If Mrs. Krauss had needed only one breast reconstructed, the Krausses would have been reimbursed in full for the actual cost of her surgery.

It perhaps appears to plaintiffs that defendant calculated how much it would reimburse plaintiffs for Dr. Sultan's fee by  multiplying his rate for single breast reconstructions ($20,000) by 150% and limiting reimbursement to that amount. But that is not the case. Defendant would have reimbursed plaintiffs for no more than $30,000 even if Dr. Sultan had charged $25,000 or $30,000 for a single breast reconstruction, because Oxford's UCR cap on bilateral microvascular breast reconstruction in the New York metropolitan area is $30,000, regardless of the surgeon's actual fee. The fact that 150% of Dr. Sultan's bill coincides with Oxford's UCR cap for bilateral

microvascular breast reconstruction is nothing more than an accident.

It is true that Ms. Krauss' other bilateral procedures – the mastectomy performed by Dr. Pressman and the two nipple reconstructions performed by Dr. Sultan – were reimbursed in full. But that is because the physician's bills were equal to or less than 150% of Oxford's UCR rate for those surgeries (See Def. Exh. D–F), not because Oxford applied a different procedure to those surgeries than it did to the initial breast reconstruction.

The record before me contains no other evidence of selective enforcement of the bilateral UCR cap. Plaintiffs adduce no evidence that Oxford paid more than 150% of the single surgery rate to other women in connection with bilateral breast reconstructions. And there is no evidence in the record that Oxford paid more than 150% of the single surgery rate in other types of bilateral surgeries such as orthopedic surgery on two knees or hips, for example.

The administrative record includes a letter from Dr. Sultan to Oxford, in which he states, "We have not seen as low a level of reimbursement... as your company has provided since we began doing this procedure nine years ago," OHP 00000279. Read most favorably to plaintiffs, all that Dr. Sultan is saying is that other insurers are more generous than Oxford. Of that I have no doubt. But an ungenerous plan is not automatically an arbitrary or capricious one.

> *(v) The Complexity of Plaintiff Geri Krauss' Surgery Does Not Warrant*
> *Deviation from the UCR.*

Finally, the Plan permits Oxford to deviate from UCR limits where the procedure is unusually complex or difficult. P00365. Plaintiffs argue that Dr. Sultan's increased skill and care in plaintiff's case justify a reimbursement in excess of the $30,000 cap. OHP 00000267, 00000274.

Nothing in the record suggests that the original breast reconstructions were unduly

complex – for example, there is no indication that complications ensued during surgery that prolonged the operation or led to any extraordinary medical intervention. OHP 00000219-21. Dr. Sultan charged his usual price ($20,000 for one breast and $40,000 for two). He did not charge a higher rate than usual due to unforeseen developments during surgery. *Post-operative* complications were observed, as noted above, but they were treated and billed separately, and so had no impact on the basic surgical fee. Cmplt. ¶¶ 34-40.

I accept plaintiffs' argument that microvascular breast reconstruction technique is inherently complex and difficult. But that complexity is reflected in the amount Oxford is willing to pay for such surgery. The UCR schedule shows a maximum reimbursement of $20,000 for a single free flap or tram flap breast reconstruction, while reimbursement for breast reconstruction with tissue expander – a simpler procedure – is capped at a UCR of just $9,385. OHP 0000029. Defendant's decision not to deviate from UCR guidelines in this case was not arbitrary and capricious.

B. Plaintiffs' Second Cause of Action: Claims Related to Skilled Nursing Services

Plaintiffs' second cause of action seeks damages under ERISA, 29 U.S.C. § 1132(a)(1)(B), for defendant's failure to reimburse the charges for post-operative skilled nursing services. Cmplt. ¶ 130. After the May 13 surgery, specialist private duty nurses attended the plaintiff at Beth Israel Hospital until May 26, 2003 and assisted her recovery. Cmplt. ¶ 32. The nurses detected at least two post-operative complications in ten days, and, without a doubt, prevented those minor complications from developing into major ones. Despite their beneficial role in plaintiff's recovery, I agree with defendant that such nursing services are excluded by the

terms of the Plan.

*1. Plaintiffs Are Entitled to* De Novo *Review Because of Defendant's Delay in Processing Their Claims.*

Plaintiffs claim that defendant failed to address their claim  for reimbursement of the nursing fees for nine months, despite their numerous letters on the subject. Oxford claims that it first saw plaintiffs' claim for these services in November 2003, and denied the claim on January 28, 2004. Def's R. 56.1 Stmt ¶ 24. Plaintiffs assert that they first submitted the claim in June, and deny ever receiving the January 28th letter. Cmplt. ¶¶ 122, 127.

Viewing the facts in a light most favorable to the plaintiffs, I will assume that defendant's delay in addressing the claims was unreasonable and review the denial *de novo*. See Nichols v. Prudential Ins. Co. of Am., 406 F.3d 98, 109 (2d Cir. 2005).

*2. Plaintiffs Are Not Entitled to Reimbursement for the Cost of Skilled Nursing Services.*

Even under *de novo* review, however, I find that the clear terms of the Plan support defendant's rejection of plaintiffs' claim. Chapter IV § 20 of the Supplemental Certificate, which defines exclusions to the Plan, specifically lists "private or special duty" nursing as a service for which no reimbursement will be provided. OHP 00000079. Plaintiffs' nurses fall within that exclusion: they were hired at the recommendation of Dr. Sultan to provide constant care solely to Ms. Krauss.

Plaintiffs' arguments that the Plan permits "in-patient hospital services," skilled nursing facility services, and "home health care" and "skilled nursing facility services" through a hospice are unavailing. The nurses hired by plaintiffs were not affiliated with a hospice or nursing facility, and they were not part of the in-patient service provided by Beth Israel. The fact that

these nurses were themselves "skilled" does not bring them within the ambit of "skilled nursing facility services." Beth Israel is a full-service hospital, not a skilled nursing facility.

Plaintiffs next argue that defendant knew or should have known that the May 13 surgery, which it precertified, would require post-operative monitoring of some kind. But knowing that someone will require private duty nursing does not impose a duty to *pay* for such care. The services covered by Oxford are a matter of contract. The contract excludes coverage for such services, whether they are necessary or not.

Plaintiffs further argue that defendant's failure to define or list "private or special duty" nurses in the Summary of Benefits waives any exclusion. I see no basis for this argument. Covered Services are defined in the Summary of Benefits; Excluded Services are listed separately in Chapter IV, a chapter clearly titled "Exclusions and Limitations." The Summary of Benefits also points Plan participants to the body of the Supplemental Certificate for terms and exclusions. OHP 00000011. Plaintiffs were on notice that private or special-duty nursing was excluded from the scope of coverage.

C. Plaintiffs' Third Cause of Action: Defendant's Breach of Fiduciary Duty

Plaintiff's third cause of action seeks equitable relief for defendant's breach of its fiduciary duties under the Plan. Cmplt. ¶ 136. Because of the conclusions reached above, no such claim would lie even if it were permissible by statute. But this claim is not statutorily permissible.

ERISA provides a cause of action "by a plan participant, beneficiary or fiduciary to enjoin any act or practice that violates any provision of this subchapter or the terms of the plan,

or... to obtain other appropriate equitable relief." 29 U.S.C. § 1132(a)(3) (2000). However, plaintiffs may not restate claims for unpaid benefits and statutory damages as claims in equity under § 1132(a)(3). Equitable remedies under § 1132(a)(3) are available only where ERISA's civil enforcement provisions do not provide adequate relief.  Varity Corp. v. Howe, 516 U.S. 489, 513-514 (1996). The Second Circuit has stated that individuals retain a right to seek equitable relief under ERISA only where such relief is "appropriate." See Devlin v. Empire Blue Cross & Blue Shield, 274 F.3d 76, 89-90 (2d Cir. 2001). "Compensatory damages, even if they resulted from a breach of fiduciary duty, are not recoverable as equitable relief under § 1132(a)(3)." Del Greco v. CVS Corp., 337 F. Supp. 2d 475, 489 (S.D.N.Y. 2004) (McMahon, J.) (internal quotations omitted).

In this case, plaintiffs' claims for relief are clearly restatements of their claims for unpaid benefits, penalties for non-disclosure, fees, and costs.


D. Plaintiffs' Fourth Cause of Action: Defendant's Delay in Addressing Plaintiffs' Grievances.[3]

*1. No Claim for Violation of Disclosure Requirements Lies Against Oxford*

Plaintiffs' seek statutory damages under ERISA for defendant's failure to provide requested documentation and act on claims requests and appeals in a timely manner. Specifically, plaintiffs argue that defendant had a duty to provide information about its UCR limits and failed to do so; that its "Explanations of Benefits" and denial letters were unreasonably slow and failed to provide clear disclosures as required by 29 U.S.C. § 1133; and

---

[3]I have already addressed the alleged delay in defendant's handling of claims for skilled nursing services. See § III.B supra. This discussion is limited to other alleged instances of delay.

that their requests for clearer statements of Oxford's policies and procedures – a request made by letter on December 9, 2003,  were improperly addressed. Cmplt. ¶¶ 135, 139.

Defendant claims that the disclosure requirements of ERISA apply only to plan administrators, which Oxford was not. Defendant is correct that no such claim lies against it.

29 U.S.C. § 1132(c)(1) requires that plan administrators comply with certain disclosure requirements mandated by ERISA. If a plan administrator does not provide the required documentation, it is subject to fines of $100 per day dating from the date of refusal.

However, not all entities that provide employee benefits are "administrators" under the statute's definition. ERISA defines a plan "administrator" as "the person specifically so designated by the terms of the instrument under which the plan is operated." If there is no person so designated in the plan documents, the plan's sponsor is deemed to be the administrator. 29 U.S.C. § 1002(16)(A) (2000). When a single employer establishes an ERISA-covered plan, that employer is deemed by law to be the sponsor. See 29 U.S.C. § 1002 (16)(B)(I) (2000). Absent a specific declaration in Plan documents that an insurance company is the administrator, this Court cannot infer co-administrator status. See Crocco v. Xerox Corp., 137 F.3d 105, 107 (2d Cir. 1998).

An entity may "administer" some elements of a covered Plan as a fiduciary without being the plan administrator. ERISA's definition of "fiduciary"covers any entity who "exercises any discretionary authority. . . respecting management of such plan" or "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002 (21)(A) (2000). Defendant is clearly an ERISA fiduciary. However, not all fiduciaries are subject to disclosure requirements under § 1132(c); only plan administrators are.

The Plan does not designate Oxford, or in fact anyone, as Plan administrator. Therefore, the employer, not Oxford, is the plan administrator. Oxford is not liable for statutory damages under 29 U.S.C. § 1132(c)(1), which by its terms imposes disclosure requirements solely on plan administrators.

*2. Errors in Claims Administration Do Not Provide a Claim for Statutory Damages.*

Plaintiffs allege that defendant's grievance procedures violate ERISA's review procedure requirements under 29 U.S.C. § 1133. Section 1133 requires that any benefit plan must include a review procedure for claims determinations, comprising written notice of a claims determination calculated to be understood by the participant, and opportunity for a full and fair review upon denial. See id. Federal regulations further require that claims reviewers make available all documents relevant to an adverse claim determination upon request of the claimant. See 29 C.F.R. § 2560-503.1(h)(2)(3) (2005); see also 29 C.F.R. § 2560-503.1(m)(8) (2005) (defining "relevant" as any document "relied upon in making the benefits determination"). Plaintiffs allege that defendant's failure to provide clear explanations of its denials and to provide necessary documents upon request constitute a violation of § 1133, and warrant equitable or statutory damages.

However, violations of § 1133 do not give rise to statutory damages under § 1132(c). See Wilczynski v. Lumbermen's Mut. Cas. Co., 93 F.3d 397, 407 (7th Cir. 1996). If defendant fails to adhere to the procedures set in § 1133, the appropriate remedy would be a remand to the administrative level for reconsideration. See Soron v. Liberty Life Ass. Co. of Boston, 318 F. Supp. 2d 19, 29 (N.D.N.Y. 2004); Cejaj v. Building Service 32B-J Health Fund, No. 02 Civ. 6141, 2004 WL 414834, *10 (S.D.N.Y. Mar. 5, 2004). Nor, under these facts, do plaintiffs have

a cause of action for damages in equity. See § III.C supra. Defendant's failure to comply with § 1133, without more, is not compensable under ERISA.

   *3. Defendant's Erroneous Reliance on the Availability of Out-Of-Network*
   *Providers as Grounds to Deny Coverage Is Not an Abuse of Discretion.*

   Plaintiffs also claim that defendant's reliance on in-network as opposed to out-of-network providers as a reason to deny coverage for the May 13, 2003 surgery is an abuse of discretion. But, in the end, Oxford did not so rely. Dr. Nancy Klotz, who performed the initial claims review, did deny coverage on the grounds that there were in-network providers who could have performed the surgery. OHP 00000280. The insurer, however, reversed that decision. And even if Oxford's temporary reliance on the in-out network distinction had not been reversed, Oxford had valid grounds for its administrative decision as well – the validity of its $30,000 UCR limit on plaintiff's $40,000 claim.


E. Plaintiffs' Sixth Cause of Action: Attorney's Fees and Costs

   "In any action under [ERISA], . . . the court in its discretion may allow a reasonable attorney's fee and costs of action to either party," 29 U.S.C. § 1132(g). "Although success on the merits is not, in theory, indispensable to an award of attorneys' fees under 29 U.S.C. § 1132(g)(1), rarely will a losing party . . . be entitled to fees." Miles v. N.Y. State Teamsters Conference Pension & Ret. Fund Employee Pension Ben. Plan, 698 F.2d 593, 602 (2d Cir. 1983) Factors considered in awarding such fees where relief has been granted are:

   (1) the degree of the offending party's culpability or bad faith, (2) the ability of the offending party to satisfy an award of attorney's fees, (3) whether an award of fees would deter other persons from acting similarly under like circumstances, (4) the relative merits of the parties' positions, and (5) whether the action sought to confer a common benefit on

a group of pension plan participants.

<u>Id.</u> at 602 n.9. In this case, where plaintiffs have not prevailed on their other claims, and where neither party has exhibited bad faith or culpability in pursuing this action, I decline to award attorney's fees for either side.

## IV. Conclusion

For the reasons stated above, Defendant's motion for summary judgment is granted. Plaintiffs' motion for summary judgment is denied. The Clerk of the Court is ordered to close this case.

This constitutes the decision and order of the Court.

December/_, 2005

_____
U.S.D.J.

BY FAX TO ALL COUNSEL